**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

Aetna Life Insurance Co.
CT Corporation System
67 Burnside Avenue
East Hartford, CT 06108-3408

and

Aetna Health, Inc.,
CT Corporation System
600 N. 2nd Street, Suite 401
Harrisburg, PA 1701-1071

Plaintiffs,

v.

Tiero, LLC
c/o Maryland Agent Service, Inc.
8007 Baileys Lane
Pasadena, MD 21122

and

Certify Global Inc. d/b/a/ Certify Health
c/o Maryland Agent Service, Inc.
8007 Baileys Lane
Pasadena, MD 21122

and

Sajad Zalzala, M.D.
6437 Argyle Street
Dearborn, MI 48126

Defendants.

Case No. 8:23-cv-01484-DLB

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Aetna Life Insurance Company and Aetna Health, Inc. (collectively, "Aetna") bring this Complaint against Defendants Tiero, LLC, Certify Global Inc. d/b/a/ Certify Health, and Sajad Zalzala, M.D., and, by its undersigned counsel, state and allege as follows:

## NATURE OF THE ACTION

1. Since early 2022, Defendants Tiero, LLC ("Tiero"), Certify Global, Inc. d/b/a Certify Health ("Certify"), and Sajad Zalzala, M.D. ("Zalzala") have engaged in a fraudulent scheme designed to extract inflated and improper reimbursement from Aetna and its plan sponsors for over-the-counter ("OTC"), at-home COVID-19 test kits.

2. Specifically, instead of billing for OTC at-home COVID-19 test kits using the procedure code specifically created for such tests (K1034), the Defendants billed for OTC at-home COVID-19 tests using procedure and place-of-service codes misrepresenting that Tiero performed COVID-19 tests for Aetna members, and did so in a medical office (CPT code 87426 with Place-of-Service code 11), neither of which was true, which caused Aetna to overpay Defendants.

3. In fact, Aetna policy required that Aetna's members directly submit claims for OTC at-home COVID-19 tests, rather than doing so through providers. Accordingly, none of the claims Tiero billed to Aetna should have been submitted or paid.

4. Because of the Defendants' fraudulent scheme, Aetna and its plan sponsors have suffered millions of dollars in damages.

## THE PARTIES

5. Plaintiff Aetna Life Insurance Company is a Connecticut corporation with its principal place of business in Hartford, Connecticut.

6. Plaintiff Aetna Health, Inc. is a Pennsylvania corporation with its principal place of business in Blue Bell, Pennsylvania.

7. Defendant Tiero, LLC is a Delaware limited liability company, with its principal place of business at 9801 Washingtonian Boulevard, Suite 200, Gaithersburg, Maryland. Tiero's sole member is URock LLC, a Delaware limited liability company. Upon information and belief, none of the members of URock LLC are domiciled in Pennsylvania or Connecticut.

8. Defendant Certify Global, Inc. d/b/a/ Certify Health is Delaware corporation, with its principal place of business at 9801 Washingtonian Boulevard, Suite 200, Gaithersburg, Maryland.

9. Defendant Sajad Zalzala, M.D. is domiciled in Michigan.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over Aetna's claims under 28 U.S.C. § 1311 because they arise under the laws of the United States. Specifically, the action seeks to enforce rights under the Employee Retirement Income Security Act of 1974 ("ERISA"), pursuant to 29 U.S.C. § 1132(a)(3).

11. This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between plaintiffs and defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Tiero and Certify because each maintains its principal place of business within this District, and each undertook or directed the conduct at issue in this case from this District.

13. This Court has personal jurisdiction over Zalzala because, among other things, he agreed and conspired with Tiero and Certify to submit the fraudulent claims at issue to Aetna

from this District, and provided information to Tiero and Certify (*e.g.*, his National Provider Identifier), which they needed and used to submit claims from this District.

14. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(2) because both Tiero and Certify maintain their principal place of business in this district, and because a substantial part of the events or omissions giving rise to the claims alleged in this action occurred in this District.

## BACKGROUND

### Aetna Insures or Administers Health Plans

15. Aetna provides healthcare insurance and claim administration services.

16. This case concerns payments made from, *inter alia*, Aetna's fully insured plans, self-funded plans, and Medicare Advantage plans.

17. Aetna brings these claims on its own behalf as the provider of fully insured health plans through which individuals, employees, and employers pay Aetna premiums in exchange for Aetna agreeing to pay their healthcare claims using Aetna assets. A portion of the claims at issue are fully insured claims. Thus, Aetna was induced to pay its own funds to Tiero and Certify as part of Defendants' improper billing scheme.

18. Aetna also brings these claims as claims administrator for self-funded, employer-established health plans that retain Aetna as a third-party administrator to process employees' healthcare claims and pay those claims out of a pool of money comprised of funds contributed by employers and their employees. For these self-funded plans, Aetna does not underwrite or insure the benefits being paid. Rather, claims covered under self-funded health plans are paid by employers and employees using their own money.

19. Through Aetna's agreements with self-funded plan sponsors, Aetna is authorized to bring this action to recover overpayments caused by Defendants' conduct.

20. Aetna delivers services pursuant to contracts between Aetna and the health plans' sponsors, which identify the rights and obligations of each party.

21. The plans delegate to Aetna discretionary authority to interpret plan documents and administer claims for benefits (*e.g.*, determining whether claims are payable). In this capacity, Aetna has administered claims and appeals on behalf of the impacted plans that originated from the Defendants.

22. Aetna's plans function in accordance with insurance policies, contracts, and/or plan documents, which establish, among other things, the rights and responsibilities of the payor entities and of the individuals who have enrolled in the policies, contracts, and/or plans.

23. The plans afford Aetna authority to recover overpayments on behalf of the self-funded plans at issue,[1] in addition to seeking recovery for payments made by Aetna's fully insured plans.

**Aetna's Adjudication of Claims**

24. In its capacity as an insurer and claims administrator, Aetna processes approximately 1.4 million healthcare claims per business day and is responsible for processing and administering hundreds of millions of healthcare claims per year.

25. Providers typically do not submit medical records with insurance claims unless Aetna requests that they do so.

[1] For example, some plans include language stating that, "[i]f a benefit payment is made by Aetna, to or on your behalf, which exceeds the benefit amount that you are entitled to receive, Aetna has the right: * [t]o require the return of the overpayment; or * [t]o reduce the amount of the overpayment, any future benefit payment made to or on behalf of that person or another person in his or her family."

26. Accordingly, by necessity, and as is common industry practice, the process by which Aetna adjudicates claims is largely automated. To facilitate that practice, Aetna relies upon providers to supply truthful and accurate information with claims and requires providers to attest to the accuracy of the claims they submit.

27. Providers and billing companies, including, upon information and belief, Tiero, Zalzala, and Certify, understand that Aetna (and other insurers) adjudicate most claims automatically, and rely on providers to submit accurate claims.

28. As relevant here, Tiero, in partnership with Certify, submits claims using the standardized CMS-1500 claim form or its electronic equivalent.

29. Procedure codes—including Current Procedural Terminology ("CPT") codes and Healthcare Common Procedure Coding System ("HCPCS") codes—are among the most important information included in a claim. Procedure codes are standardized codes that denote the type of medical services rendered to a patient and for which reimbursement is being requested. They are the principal way in which providers convey to insurers the services for which they seek payment.

30. Aetna relies on providers to accurately represent the service(s) provided to its members through procedure codes. When a provider supplies an inaccurate procedure code with a claim, it can cause Aetna to pay more than is warranted by the service provided.

31. Providers and billing companies, including, upon information and belief, Tiero, Zalzala, and Certify, understand that Aetna and other insurers rely on the accuracy of the information supplied with claims.

32. Providers and billing companies, including, upon information and belief, Tiero, Zalzala, and Certify, understand that misrepresentations—including the use of procedure codes

that do not accurately reflect the type of service provided—can cause Aetna and other commercial insurers to overpay.

**At-Home COVID-19 Diagnostic Tests and Applicable Regulations**

33. To help reduce the spread of COVID-19 and more quickly diagnose the disease during the COVID-19 pandemic, the federal government took several actions to expand access to COVID-19 testing, including access to OTC at-home tests.

34. From January 15, 2022 until the end of the COVID-19 public health emergency on May 11, 2023, the federal government required private health insurance companies and group health plans to cover the cost of FDA-approved OTC at-home COVID-19 tests.[2] Up to eight tests per individual could be covered each month without any cost-sharing requirements from the individual.

35. On April 4, 2022, the Centers for Medicare and Medicaid Services ("CMS") announced that individuals with Medicare Part B, including those enrolled in Medicare Advantage plans, would be able to receive up to eight FDA-approved OTC at-home COVID-19 tests per month at no out-of-pocket cost from participating pharmacies and healthcare providers.[3] The tests would be covered directly by Medicare and not under the individual's Medicare Advantage plan. In other words, pharmacies and healthcare providers would bill Medicare directly, and not the Medicare Advantage plan.

---

[2] *See* U.S. Dep't of Health & Human Servs., *Biden-Harris Administration requires Insurance Companies and Group Health Plans to Cover the Cost of At-Home COVID-19 Tests, Increasing Access to Free Tests* (Jan. 10, 2022), https://www.hhs.gov/about/news/2022/01/10/biden-harris-administration-requires-insurance-companies-group-health-plans-to-cover-cost-at-home-covid-19-tests-increasing-access-free-tests.html; *see also* U.S. Dep't of Health & Human Servs., *Fact Sheet: End of the COVID-19 Public Health Emergency*, https://www.hhs.gov/about/news/2023/05/09/fact-sheet-end-of-the-covid-19-public-health-emergency.html (May 9, 2023).

[3] Centers for Medicare & Medicaid Servs., *Biden-Harris Administration Announces a New Way for Medicare Beneficiaries to Get Free Over-the-Counter COVID-19 Tests* (Apr. 4, 2022), https://www.cms.gov/newsroom/press-releases/biden-harris-administration-announces-new-way-medicare-beneficiaries-get-free-over-counter-covid-19.

36. Beginning no later than April 4, 2022, CMS instructed healthcare providers to use HCPCS code K1034 to bill for each OTC at-home COVID-19 test.[4]

37. Since April 4, 2022, CMS has continued to provide the same coding guidance, which is publicly available.[5]

38. HCPCS code K1034 "applies to all OTC, FDA-approved, authorized, or cleared COVID-19 tests (that are self-administered with a specimen that's self-collected)."

39. Since at least April 4, 2022, CMS has made clear that "All payer types, including private insurance . . . can use HCPCS code K1034."[6] Medicare reimbursement is $12 per test.

40. Since the implementation of these policies, the U.S. Department of Health and Human Services Office of Inspector General ("HHS-OIG") issued a consumer alert that "[f]raudsters are offering COVID-19 services in exchange for personal details, including Medicare information."[7] For example, "[s]cammers are selling fake and unauthorized at-home COVID-19 test kits in exchange for [people's] personal or medical information." According to HHS-OIG, "[t]he personal information collected can be used to fraudulently bill federal health care programs and commit medical identity theft."

41. HHS-OIG advises consumers to "[b]e mindful of advertisements for COVID-19 testing or treatments on social media," "[b]e suspicious of any unexpected calls or visitors offering COVID-19 tests," and "[d]o not respond to, or open links in, text messages about COVID-19 from unknown individuals."

---

[4] Centers for Medicare & Medicaid Servs., *COVID-19 Over-the-Counter Tests* (Apr. 4, 2022), https://web.archive.org/web/20220404183740/https://www.cms.gov/COVIDOTCtestsProvider.

[5] Centers for Medicare & Medicaid Servs., *COVID-19 Over-the-Counter Tests* (May 1, 2023), https://www.cms.gov/COVIDOTCtestsProvider#howtobill.

[6] Centers for Medicare & Medicaid Servs., *COVID-19 Over-the-Counter Tests* (Apr. 4, 2022), https://web.archive.org/web/20220404183740/https://www.cms.gov/COVIDOTCtestsProvider.

[7] U.S. Dep't of Health & Human Servs., Office of Inspector General, *Fraud Alert: COVID-19 Scams* (Feb. 28, 2023), https://oig.hhs.gov/fraud/consumer-alerts/fraud-alert-covid-19-scams/.

42. The Federal Communications Commission ("FCC") also issued a consumer alert that "[a]s COVID-19 lingers, scammers continue to prey on people's hopes and fears in attempts to steal insurance information, money, or both," with "[m]any of the scammers peddling phony products ask[ing] for personal information, such as Social Security numbers, Medicare, or private health insurance information, which can result in identity theft and be used in future scams."[8] The FCC advises consumers to "[a]lways be wary of any unsolicited offers that require you to provide your insurance or doctor's information."

43. Similarly, the Federal Trade Commission ("FTC") issued a consumer alert regarding scammers targeting Medicare recipients "with a fake offer to get 'free COVID tests'" in an effort to convince individuals to provide their Medicare information, which scammers use to bill fraudulent charges.[9] According to the FTC, the scammers "call[] and run[] websites, online and television ads to try to convince people to give their Medicare information." "Many Medicare recipients . . . signed up for these free COVID tests and never got them."

**The Defendants**

44. Tiero, founded in August 2020, describes itself as a healthcare platform that "build[s] a modern infrastructure linking providers and payers . . . to simplify healthcare management."[10]

45. Upon information and belief, Tiero was originally intended to facilitate telemedicine services, but later pivoted to providing OTC at-home COVID-19 test kits.

46. Tiero advertises itself as a provider of "free" at-home COVID-19 test kits and operates an online platform from which anyone "covered under a US based health insurance

---

[8] Fed. Commc'ns Comm'n, *Bogus COVID-19 Tests and Pharmacy Offers* (Mar. 7, 2022), https://www.fcc.gov/bogus-covid-19-tests-and-pharmacy-offers.
[9] Fed. Trade Comm'n, *Free COVID test scam targets people on Medicare* (Aug. 23, 2022), https://consumer.ftc.gov/consumer-alerts/2022/08/free-covid-test-scam-targets-people-medicare.
[10] https://www.tiero.com/about/.

plan"[11] can order tests on a subscription basis, to be shipped to the person's home every month. Tiero advertises these tests as "FDA Compliant" and provided at "ZERO cost . . . with no out-of-pocket fees."[12]

47. Tiero's website explains the process for receiving tests in three steps: (1) an individual registers with Tiero; (2) Tiero submits a claim to the individual's insurance company; and (3) *if the individual's insurance pays for tests*, Tiero ships tests monthly to the person's home or workplace.

48. Tiero advertises through radio, television, and on the internet, including paid advertisements on social media platforms. Tiero also sends email and text message solicitations.

49. In addition to its website (www.tiero.com), Tiero maintains a social media presence on Twitter and on Facebook. Tiero has had several Facebook pages. Facebook users have noted that at least one of Tiero's pages have been shut down, and that as of November 2022, Tiero had made its fourth Facebook page.

50. Upon information and belief, after Aetna raised concerns with Tiero about its billing practices, Tiero deleted all posts on its Facebook and Twitter accounts relating to its provision of at-home COVID-19 tests, including comments in response to such posts by users complaining about Tiero and asserting that Tiero was engaged in fraudulent practices.

51. Tiero also offers at-home COVID-19 test kits through freetest.com.

52. Tiero engaged in the scheme described herein with, *inter alia*, Certify and Zalzala.

53. Certify was founded in 2012 and advertises as "a seamless patient experience via biometric authentication and digital intake solutions."[13]

---

[11] https://www.tiero.com/.
[12] *Id.*
[13] https://www.certifyhealth.com/about-us/.

54. Certify purportedly facilitates patient interactions, including appointment scheduling, registration and paperwork, communications, and payment collection.[14]

55. Certify advertises that its billing and payment collection service "[i]ncrease[s] payments" by "making the billing process as easy & painless as possible."

56. Tiero and Certify share the same office space in Gaithersburg, Maryland.

57. Tiero and Certify have the same or substantially similar owners. Both Tiero and Certify are portfolio companies of URock Ventures, a venture capital firm founded by Marc Potash (who also founded Certify).

58. Tiero is owned by URock, LLC.

59. Upon information and belief, Certify is also owned by URock, LLC.

60. Upon information and belief, Tiero and Certify have the same or substantially the same ownership, leadership, and use the same office space.

61. Tiero purportedly entered into a partnership with Certify on or around September 2, 2021 to provide "a seamless, free, and HIPAA compliant solution for telemedicine."

62. Upon information and belief, Tiero and Certify agreed for Tiero to use Certify's services, which include the handling of any protected health information ("PHI") that Tiero receives.[15]

63. After the filing of Aetna's Complaint, Tiero modified its website and the agreements thereon to remove most of the references to Certify.[16]

---

[14] https://www.certifyhealth.com/digital-intake-onboarding/.
[15] https://www.tiero.com/business-associate-agreement/.
[16] *Compare* https://www.tiero.com/business-associate-agreement/ (current link) with *https://web.archive.org/web/20230320095539/https://www.tiero.com/business-associate-agreement/* (archive as of March 20, 2023).

64. Upon information and belief, in connection with this agreement, Certify works with Tiero to prepare and submit claims for Tiero's OTC at-home COVID-19 tests to health insurers such as Aetna.

65. Upon information and belief, when Aetna paid Tiero for the claims at issue, the checks that Aetna paid to Tiero were guaranteed by the receiving bank on behalf of Certify.[17]

66. Exhibit B hereto includes fifteen checks paid by Aetna to Tiero, totaling $ 354,567.65 with endorsement guarantees for Certify.

67. In addition, when the Defendants called Aetna regarding the claims at issue, they would often call using Certify's telephone number rather than Tiero's phone n umber.

68. Certify's phone number ((650) 425-3050) was used to call Aetna at least 30 times to try to obtain payment from Aetna on dozens of claims billed using Tiero's billing identifiers.

69. Other times, the Defendants would call Aetna from Tiero's phone number.

70. Zalzala is a physician located in Dearborn, Michigan, and specializes in telemedicine.

71. The claims that Tiero and Certify submitted to Aetna typically list Zalzala as the referring provider and the rendering provider.

72. Upon information and belief, Zalzala agreed with Tiero and Certify to allow them to use his name and National Provider Identifier ("NPI") to bill for the at-issue claims.

73. Tiero's NPI reflects that Zalzala is an "authorized official" for Tiero, and the taxonomy associated with Tiero's NPI is a "multi-specialty group" and "internal medicine."[18]

74. Tiero identifies Zalzala as a "business associate" on its website.[19]

---

[17] The endorsement guarantee designations are for Certify Global LLC, an entity dissolved in 2015, and upon information and belief, was replaced by Defendant Certify Global Inc.
[18] https://npiregistry.cms.hhs.gov/provider-view/1053901256.
[19] https://www.tiero.com/terms-of-use/.

75. Zalzala has been affiliated with a number of telehealth companies, including The Pill Club Medical Group, Inc., an online health platform offering birth control and contraceptives, which recently settled with the California Department of Insurance over allegations of submitting fraudulent claims to insurance companies.[20]

**The Defendants' Fraudulent Scheme**

76. Tiero engaged in extensive marketing to cause individuals, including Aetna members, to sign up for OTC at-home COVID-19 tests through Tiero.

77. To sign up with Tiero, individuals had to register on Tiero's website, where they were asked to provide a variety of personal information as well as an image of their insurance card.

78. Once an individual completed the registration process, Tiero billed their insurer.

79. Tiero states on its website that it does not ship COVID-19 tests unless and until the insurer pays for the tests.

80. Aetna policy required Aetna members to directly submit claims for OTC at-home COVID-19 tests. Accordingly, none of the at-issue claims should have been billed by Tiero.

81. In addition to improperly billing Aetna directly, Defendants' billing for services or supplies not yet rendered is an additional misrepresentation. According to the National Uniform Claim Committee's 1500 Health Insurance Claim Form Reference Instruction Manual, the "Date of Service" on a claim "indicates the actual month, day, and year the service(s) was provided."

82. In addition, when the Defendants billed Aetna, instead of billing for OTC at-home COVID-19 test kits using the procedure code specifically created for such tests (K1034), they used procedure and place-of-service codes that misrepresented that Tiero performed COVID-19

---

[20] Cal. Dep't of Ins., *Commissioner Lara announces online health provider The Pill Club pays $3.2 million over alleged fraudulent claims practices* (Feb. 7, 2023), http://www.insurance.ca.gov/0400-news/0100-press-releases/2023/release006-2023.cfm.

tests for Aetna members, and did so in a medical office, which elicited improper higher reimbursements.

83. Specifically, the Defendants billed for the at-home COVID-19 tests at issue using CPT code "87426" and Place of Service code "11."

84. CPT code 87426 is defined as: "Infectious agent antigen detection by immunoassay technique (e.g., enzyme immunoassay [EIA], enzyme-linked immunosorbent assay [ELISA], fluorescence immune [FIA], immunochemiluminometric assay [IMCA]), qualitative or semiquantitative, severe acute respiratory syndrome coronavirus (e.g., SARS-CoV, SARS-CoV-2 [COVID-19])."

85. The American Medical Association's CPT 2022 Professional Edition codebook states that codes in the "Pathology and Laboratory" section (*i.e.*, in the 80000 series, including 87426) are "provided by a physician or by technologists under responsible supervision of a physician."

86. The at-home COVID-19 tests allegedly provided by Tiero were self-administered (by patients), not by a physician or technologists under the responsible supervision of a physician.

87. Nearly all the claims at issue were billed by the Defendants after the creation of HCPCS code K1034, which was created specifically for OTC at-home COVID-19 tests.

88. HCPCS code K1034 is defined as: "Provision of COVID-19 test, nonprescription *self-administered and self-collected use*, FDA approved, authorized or cleared, one test count."[21]

89. No later than April 4, 2022, CMS issued guidance directing the use of K1034 to bill for single at-home COVID-19 test. In its guidance, CMS stated "[t]his code applies to all [over-

[21] Centers for Medicare & Medicaid Servs., *COVID-19 Over-the-Counter Tests* (May 1, 2023), https://www.cms.gov/COVIDOTCtestsProvider (emphasis added).

the-counter], FDA-approved, authorized, or cleared COVID-19 tests (that are self-administered with a specimen that's self-collected."[22]

90. Thus, each time the Defendants used CPT code 87426 instead of HCPCS code K1034 for an at-home COVID-19 test, they misrepresented that the tests were provided by a physician or by technologists under responsible supervision of a physician.

91. In addition, the Defendants billed for the tests using Place of Service code "11," which represented that the service billed for was performed in a medical "office."

92. Place of Service code "11" represents that the service was performed in a "[l]ocation, other than a hospital, skilled nursing facility (SNF), military treatment facility, community health center, State or local public health clinic, or intermediate care facility (ICF), *where the health professional routinely provides health examinations, diagnosis, and treatment of illness or injury on an ambulatory basis*."[23]

93. Not only did the Defendants not perform the tests they billed for, they had no relation to any medical office, nor did they routinely provide health examinations, diagnosis, or treatment of illness or injury in *any* office with any relationship to the at-home tests at issue.

94. Even Tiero's NPI, which the Defendants used to bill each of the tests at issue, was established in a way that inaccurately portrays Tiero as a "Multi-Specialty Group" and a practitioner of "Internal Medicine."[24] Yet, upon information and belief, Tiero is neither.

[22] Centers for Medicare & Medicaid Servs., *COVID-19 Over-the-Counter Tests* (Apr. 4, 2022), https://web.archive.org/web/20220404183740/https://www.cms.gov/COVIDOTCtestsProvider.
[23] Centers for Medicare & Medicaid Servs., *Place of Serv. Code Set* (Sept. 2021), https://www.cms.gov/Medicare/Coding/place-of-service-codes/Place_of_Service_Code_Set (emphasis added).
[24] https://npiregistry.cms.hhs.gov/provider-view/1053901256.

95. The Defendants also typically inaccurately identified Zalzala on their claims as the "referring provider," when in reality patients were identified by Defendants through direct advertising, not through a referral by Zalzala.

96. As set forth above, the claims never should have been billed to Aetna by Tiero.

97. In addition, if Defendants had correctly coded (K1034) the at-home COVID-19 tests billed to Aetna, then the claims would have been denied by Aetna or, at a minimum, paid at substantially lower rates than the Defendants were paid because of their fraud.

98. In addition to the misrepresentations the Defendants made to Aetna, they manipulated the billing process to overcome limits built into Aetna's claims processing systems.

99. Aetna's policies regarding claims submitted under CPT code 87426 limit the number of in-office and on-site COVID-19 tests that a member may receive in a single day.

100. Because Tiero typically billed for eight tests at a time, it circumvented Aetna's limits on the number of tests billed per day by breaking up its billing over multiple days.

101. Specifically, since at least September 2022, Tiero has split its bills over several dates of service by billing tests in increments of three or fewer on different dates for the same patient.

102. For example, between December 27, 2022 and January 15, 2023, Tiero billed Aetna for 21 tests on behalf of a member, and split the claims into 2-3 tests each day:

- December 27, 2022: Billed 3 COVID-19 tests
- December 28, 2022: Billed 3 COVID-19 tests
- December 29, 2022: Billed 2 COVID-19 tests
- January 3, 2023: Billed 3 COVID-19 tests
- January 4, 2023: Billed 2 COVID-19 tests
- January 13, 2023: Billed 3 COVID-19 tests
- January 14, 2023: Billed 3 COVID-19 tests
- January 15, 2023: Billed 2 COVID-19 tests

This manner of billing is incorrect and conceals the true nature of the service and the dates on which the tests were provided.

103. For members with Aetna Medicare Advantage plans, Aetna does not reimburse for OTC at-home COVID-19 tests. Instead, Aetna Medicare Advantage members were required to obtain tests from participating providers and pharmacies, which bill Medicare directly (and not Aetna) in accordance with CMS policies. The Defendants billed Aetna for OTC at-home COVID-19 tests for Medicare Advantage members in violation of these requirements.

104. Similarly, to be eligible for reimbursement, tests must be used to diagnose a potential COVID-19 infection. Tests used for employment, school, or recreational purposes are not eligible for reimbursement unless required by state law. Upon information and belief, Tiero, Certify, and Zalzala billed Aetna for tests provided through employers or for employment purposes.

105. Often, people either never received tests or received only some tests. According to complaints, Tiero "just take[s] all your insurance and personal info and never talk[s] to you again."

106. One person reported that her insurer paid for the tests she ordered, but she still had not received the tests eight weeks later. The only communication she received from Tiero was that the tests still "are pending insurance approval."

107. Another individual reported that her insurer paid for the tests ordered, but she never received any tests despite Tiero claiming that the tests shipped more than two weeks ago.

108. Aetna received numerous complaints from its members involving similar issues. A member notified Aetna that Tiero refused to send the tests she ordered, citing Aetna's denial of the claims, when in fact, Aetna had paid for tests six times.

109. For those who do receive tests from Tiero, many experienced other issues. For example, some received abnormally large quantities of tests at a time. One received 24 tests at

once to make up for the previous months when they did not receive any tests, despite Aetna paying Tiero during those previous months. Another received 12 tests, followed by 8 more tests, noting confusion: "I don't know what is going on!!!" And yet another reported that she "received MANY Covid 19 test kits, many times," despite requesting only one test.

110. At least one individual complained directly to Zalzala after he charged her health insurer for tests that she did not order.

111. Aetna members also reported receiving tests that were set to expire shortly after receipt. For example, a member received 16 tests in December 2022, only for the tests to expire the next month in January 2023. Others received tests that expired as soon as the following week.

112. When members attempted to cancel Tiero's service and stop the billing and delivery of at-home COVID-19 tests, they often encountered technical difficulties or otherwise faced active pushback from Tiero. For example, when a member called Tiero to unsubscribe, a Tiero representative tried to persuade her to maintain the subscription, explaining that the service was "free" and provided "at no cost to the member."

113. Members also encountered issues with Tiero's website when attempting to cancel their service. Despite navigating through their account portal on Tiero's website and clicking on "Cancel Registration" prompts, the next time a member logs back into their account, it indicates that they are still subscribed to Tiero's service.

### Aetna Paid Tiero and Certify More than $8 Million in Fraudulent Claims

114. Aetna has paid more than $8 million for OTC at-home COVID-19 tests that were billed fraudulently, were not authorized, and/or were not actually provided.

115. Tiero, Certify, and Zalzala have unique possession of the records that would enable Aetna to determine conclusively the full universe of fraudulently billed claims, but Aetna is attaching as Exhibit A hereto a de-identified excerpt of the claims at issue.

116. Simultaneously with the filing of this Amended Complaint, Aetna is providing counsel for the Defendants with a spreadsheet that includes more than 80,000 code lines submitted to Aetna by Defendants between January 1, 2022 and July 13, 2023, with a total amount paid by Aetna exceeding $7,700,000. Given the volume of Protected Health Information, the size of the data, and limitations on the ECF system, the document is not being filed at this time, but is incorporated by reference as if fully set forth herein. Upon entry of a HIPAA Qualified Protective Order, Aetna will provide complete claims data to Defendants.

117. Aetna reserves the right to place additional fraudulent claims at issue through discovery, including because certain information is in the unique possession of the Defendants.

## CLAIMS FOR RELIEF

### COUNT I: FRAUD
### (All Defendants)

118. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

119. Between January 2022 and the present, Tiero, Certify, and Zalzala submitted or caused tens of thousands of claims to be submitted to Aetna for OTC at-home COVID-19 tests utilizing a CMS-1500 claim form or its electronic equivalent.

120. On such claims, Tiero, Certify, and Zalzala made numerous representations to Aetna, including, without limitation, the type of tests they provided, where the tests were provided, and their dates of service.

121. The Defendants' misrepresentations to Aetna included, without limitation, the following when billing for OTC at-home COVID-19 tests that patients self-administered:

a. CPT code 87426;

b. Place of Service Code 11;

c. Tiero's NPI, which identified it as a Multi-Specialty Group and provider of Internal Medicine;

d. Dates of Service when no service or supply was provided; and

e. OTC at-home COVID-19 tests not ordered by patients.

122. These misrepresentations were material to Aetna's payment of claims that the Defendants submitted or caused to be submitted to Aetna because they impacted whether, and to what extent, the Defendants' claims were paid by Aetna.

123. Upon information and belief, Tiero, Certify, and Zalzala knew that their representations were false or had no reasonable basis to believe in the truth of their representations.

124. Tiero, Certify, and Zalzala intended and expected that Aetna would rely on these representations in paying the claims they submitted to Aetna.

125. Aetna processes and administers hundreds of millions of healthcare claims per year.

126. Accordingly, by necessity, and as is common industry practice, the process by which Aetna adjudicates claims is largely automated. To facilitate that practice, Aetna relies upon providers to supply truthful and accurate information with claims and requires providers to attest

to the accuracy of the claims they submit, including accurate representation of the service(s) provided to Aetna's members through procedure codes.

127. When a provider supplies an inaccurate procedure code with a claim, it can cause Aetna to pay more than is warranted by the service provided.

128. Providers and billing companies understand that insurers rely on the accuracy of claims and certify the accuracy of the claims they submit. Upon information and belief, Tiero, Certify, and Zalzala had the same understanding.

129. Tiero, Certify, and Zalzala further intended to obtain payments from Aetna to which they were not entitled.

130. Aetna did not know that the Defendants' representations were false.

131. Aetna reasonably and justifiably relied on these misrepresentations in paying claims submitted by Tiero, Certify, and Zalzala.

132. Aetna reasonably relied on the truthfulness of the information Tiero, Certify, and Zalzala included in the claims they submitted to Aetna or caused to be submitted to Aetna.

133. Aetna has been damaged by Defendants' misrepresentations in that Defendants deceived Aetna into overpaying millions of dollars on their claims.

**COUNT II: AIDING AND ABETTING FRAUD**
**(All Defendants)**

134. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

135. This cause of action is asserted against each of the Defendants in the alternative to Count I.

136. Under Maryland law, Tiero's, Certify's, and Zalzala's conduct constitutes aiding and abetting fraud.

137. As described above, the Defendants committed fraud by knowingly submitting fraudulent claims to Aetna, including, without limitation, misrepresentations regarding the type of tests provided, where the tests were provided, and their dates of service.

138. Each of Tiero, Certify, and Zalzala were at all times aware of each of their respective roles in the illegal and fraudulent schemes, and knowingly and substantially assisted, encouraged, incited, aided, and abetted the fraudulent conduct, as set forth above.

139. As a direct and proximate result of Certify and Zalzala aiding and abetting Tiero's fraud, Aetna has suffered injury. Specifically, as a result of Tiero's, Certify's, and Zalzala's conduct, aided and abetted by the other Defendants, Aetna overpaid Defendants by millions of dollars.

**COUNT III: NEGLIGENT MISREPRESENTATION**
**(All Defendants – In the Alternative to Count I)**

140. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

141. This cause of action is asserted against each of the Defendants in the alternative to Count I.

142. Tiero, Certify, and Zalzala submitted claims containing material misrepresentations, or caused such claims to be submitted, including those described above.

143. Upon information and belief, Tiero, Certify, and Zalzala knew their representations were false, made them without knowledge of their truth or falsity, or made them under circumstances in which they ought to have known of their falsity.

144. Tiero, Certify, and Zalzala intended or expected that Aetna would rely on the false information to induce Aetna in its payment of those claims.

145. Aetna processes and administers hundreds of millions of claims per year.

146. Accordingly, by necessity, and as is common industry practice, the process by which Aetna adjudicates claims is largely automated. To facilitate that practice, Aetna relies upon providers to supply truthful and accurate information with claims and requires providers to attest to the accuracy of the claims they submit, including accurate representation of the service(s) provided to Aetna's members through procedure codes.

147. When a provider supplies an inaccurate procedure code with a claim, it can cause Aetna to pay more than is warranted by the service provided.

148. Providers and billing companies understand that insurers rely on the accuracy of claims and the certification of accuracy in the claims they submit. Upon information and belief, Tiero, Certify, and Zalzala had the same understanding.

149. Aetna did not know that the foregoing representations were false, and reasonably and justifiably relied on these representations in paying claims submitted by the Defendants.

150. Aetna reasonably relied on the truthfulness of the information Tiero, Certify, and Zalzala included in the claims they submitted to Aetna.

151. Tiero, Certify, and Zalzala had superior and special knowledge of the material misrepresentations, which was not reasonably discoverable through ordinary observation.

152. Tiero, Certify, and Zalzala, had a duty of care and a duty to truthfully and accurately disclose to Aetna information material to the claims that they submitted for reimbursement, including but not limited to the following reasons:

a. the nature of their business relationship;

b. the pecuniary interest the Defendants had in the claims at issue;

c. the intimate nexus between Defendants and Aetna given the thousands of claims submitted to Aetna by Defendants;

d. the Defendants suppressed or concealed facts that materially qualify other representations that they made;

e. the importance of accuracy in insurance claims;

f. the importance to the public of accurate expenditures on medical treatment relating to or arising from the COVID-19 pandemic; and

g. the Defendants knew that the claims information was to be provided to Aetna for a serious purpose; the Defendants intended for Aetna to rely on the information; that, if false, the information would cause harm to Aetna; and that in morals and good conscience Aetna had the right to rely on the Defendants for information about the services Defendants purportedly provided.

153. Tiero, Certify, and Zalzala failed to exercise reasonable care and failed to disclose the material misrepresentations described above.

154. Aetna has been damaged as a direct and proximate result of the Defendants' misrepresentations, in that they caused Aetna to overpay the Defendants by millions of dollars.

**COUNT IV: CIVIL CONSPIRACY**
**(All Defendants)**

155. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

156. Tiero, Certify, and Zalzala agreed and conspired with one another to unlawfully, fraudulently, and deceptively procure funds from Aetna and its plan sponsors that they were not entitled to for the reasons set forth above.

157. To achieve and accomplish the aforementioned unlawful acts and objectives, Tiero, Certify, and Dr. Zalzala conspired and agreed to engage in the fraudulent acts as set forth above.

158. Upon information and belief, Tiero, Certify, and Zalzala conspired and agreed to submit or cause tens of thousands of claims to be submitted to Aetna for OTC at-home COVID-

19 tests, with numerous misrepresentations including, without limitation, the types of tests provided, where the tests were provided, and their dates of service.

159. As set forth in further detail above, upon information and belief, Certify coordinated with Tiero on the logistics of handling patient information and to prepare and submit claims for Tiero's tests to health insurers such as Aetna.

160. Upon information and belief, when Aetna paid Tiero for the claims at issue, the checks received from Aetna were guaranteed on behalf of Certify and the proceeds of the fraud were deposited into a bank account controlled by Certify.

161. Tiero and Certify also share the same office space in Gaithersburg, Maryland, and Certify's telephone number was used in connection with attempts to gain payment from Aetna on fraudulent claims.

162. Zalzala also entered into a "Business Associate" agreement with Tiero and provided Tiero and Certify with his name and NPI for use to bill for the at-issue claims.

163. Zalzala serves as the "authorized official" for Tiero's NPI.

164. Tiero's ability to use Zalzala's NPI has allowed it to submit the at-issue claims.

165. The concerted actions of Tiero, Certify, and Zalzala caused Aetna and its plan sponsors to pay more for OTC at-home COVID-19 tests than the Defendants would have received but for their fraudulent misrepresentations.

166. As a direct and proximate result of Defendants' conspiracy, Aetna and its plan sponsors overpaid Tiero's claims by millions of dollars.

**COUNT V: INSURANCE FRAUD – PENNSYLVANIA CONSOLIDATED STATUTES (18 Pa. C.S.A. § 4117) (All Defendants)**

167. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

168. As set forth above, each of Tiero, Certify, and Zalzala presented or caused to be presented to Aetna and its plan sponsors statements forming a part of a claim that contained false, incomplete, or misleading information concerning facts material to the claim.

169. In the alternative, each of Tiero, Certify, and Zalzala assisted, abetted, or conspired with the others to prepare or make statements that were presented to Aetna and its plan sponsors in connection with, or in support of, a claim that contains false, incomplete, or misleading information concerning facts material to the claim.

170. The false, incomplete, and misleading information included on the claims by Defendants are described above. In short, Tiero, Certify, and Zalzala presented or caused to be presented claims with multiple misrepresentations on each claim, including, without limitation, the type of test, the referring provider, where the tests were provided, and when Tiero provided the tests.

171. Upon information and belief, Defendants did so knowingly and with the intent to defraud.

172. Aetna processes and administers hundreds of millions of healthcare claims per year.

173. Accordingly, by necessity, and as is common industry practice, the process by which Aetna adjudicates claims is largely automated. To facilitate that practice, Aetna relies upon providers to supply truthful and accurate information with claims and requires providers to attest to the accuracy of the claims they submit, including accurate representation of the service(s) provided to Aetna's members through procedure codes.

174. When a provider supplies an inaccurate procedure code with a claim, it can cause Aetna to pay more than is warranted by the service provided.

175. Providers and billing companies understand that insurers rely on the accuracy of claims and the certification of accuracy in the claims they submit. Upon information and belief, Tiero, Certify, and Zalzala had the same understanding.

176. Aetna did not know that the Defendants' representations were false and reasonably and justifiably relied on them in paying claims submitted by Tiero, Certify, and Zalzala.

177. Aetna has been damaged in Pennsylvania by Defendants' misrepresentations in that Defendants deceived Aetna into overpaying on their claims by millions of dollars.

178. Defendants engaged in a pattern of violating 18 Pa. C.S.A. § 4117(g), as they did so across thousands of claims billed to Aetna.

**COUNT VI: INSURANCE FRAUD – CONNECTICUT GENERAL STATUTES (C.G.S.A. § 53-442 – 444) (All Defendants)**

179. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

180. As set forth above, each of Tiero, Certify, and Zalzala presented or caused to be presented to Aetna and its plan sponsors written statements in support of a claim for payment or other benefit from plans providing health care benefits that contained false, incomplete, deceptive, and misleading information concerning facts material to the claims, including, without limitation, the type of test, the referring provider, where the tests were provided, and when Tiero provided the tests.

181. As set forth above, each of Tiero, Certify, and Zalzala assisted, abetted, solicited, or conspired with the other Defendants to prepare or present a written statement to Aetna and its

plan sponsors in support of a claim for payment that contained false, incomplete, deceptive, and misleading information concerning facts material to the claims.

182. Upon information and belief, Defendants did so knowingly and with the intent to defraud.

183. Aetna processes and administers hundreds of millions of healthcare claims per year.

184. Accordingly, by necessity, and as is common industry practice, the process by which Aetna adjudicates claims is largely automated. To facilitate that practice, Aetna relies upon providers to supply truthful and accurate information with claims and requires providers to attest to the accuracy of the claims they submit, including accurate representation of the service(s) provided to Aetna's members through procedure codes.

185. When a provider supplies an inaccurate procedure code with a claim, it can cause Aetna to pay more than is warranted by the service provided.

186. Providers and billing companies understand that insurers rely on the accuracy of claims and the certification of accuracy in the claims they submit. Upon information and belief, Tiero, Certify, and Zalzala had the same understanding.

187. Aetna did not know that the Defendants' representations were false and reasonably and justifiably relied on them in paying the claims.

188. Aetna has been damaged in Connecticut by Defendants' misrepresentations in that Defendants deceived Aetna into overpaying on their claims by millions of dollars.

**COUNT VII: ESTOPPEL, 29 U.S.C § 1132(a)(3)**
**(All Defendants)**

189. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

190. Aetna is a claims administrator for certain health benefit plans governed by ERISA, 29 U.S.C. § 1001, *et seq*. (the "ERISA Plans").

191. Section 502(a)(3) of ERISA permits fiduciaries to obtain appropriate equitable relief to redress such violations or enforce provisions of ERISA Plans.

192. Aetna has standing under 29 U.S.C. § 1132(a)(3) because it is afforded discretion to, *inter alia*, interpret the ERISA Plans, including the ability to determine and adjudicate claims and appeals on behalf of the ERISA Plans.

193. Although the specific terms of the impacted ERISA Plans vary, the following examples are reasonably representative and relevant to the Defendants' conduct:

a. Aetna is given "full and sole discretionary authority" to interpret the plans.

b. "If a benefit payment is made by the Plan, to or on [the member's] behalf, which exceeds the benefit amount that [the member is] entitled to receive, the Plan has the right to require the return of the overpayment."

c. Exclusions from coverage, including:

   i. "Any health or dental examinations needed because a third party requires the exam. . . . [such as] examinations to keep or get a job, . . . go to school, camp, sporting event, or to join in a sport of other recreational activity."

   ii. "Services [the member] has no obligation to pay."

   iii. "Services that would not otherwise be charged if [the member] did not have coverage under the plan."

   iv. "Any service or supply primarily for your convenience and personal comfort or that of a third party."

d. When using out-of-network providers, members are "responsible for . . . [s]ubmitting your own claims and getting precertification," if applicable.

e. The "plan pays for its share of the expense for covered services only if the general requirements are met, [including that] the service is medically necessary."

f. Plans include terms identifying the reimbursement methodology used to determine the Recognized Charge for out-of-network providers, such as Tiero.

g. Aetna "reserve[s] the right to apply our reimbursement policies to all out-of-network services including involuntary services [and o]ur reimbursement policies may affect the recognized charge."

h. In the event of fraud or intentional misrepresentation of material facts, Aetna may rescind coverage, deny benefits, and/or recover amounts already paid.

194. Aetna seeks equitable relief in the form of estoppel pursuant to 28 U.S.C. § 1132(a)(3).

195. Each of Tiero, Certify, and Zalzala knew the true facts (*e.g.*, the nature of the tests, their location, and the date provided (if at all)).

196. Each of Tiero, Certify, and Zalzala intended for their representations to be relied upon by Aetna in paying the claims, as it is the expectation for any claim for benefits, and intended to induce Aetna in its payment of those claims to the benefit of the Defendants.

197. The Defendants' representations were false and material to their claims, as detailed herein.

198. Aetna was ignorant of the true facts.

199. Aetna reasonably relied on the representations made by the Defendants, to its

detriment.

200. The Defendants' representations caused overpayments to Tiero and Certify, in violation of the terms of the ERISA Plans, as set forth above.

201. As a result, Aetna seeks the equitable remedy of estoppel pursuant to 29 U.S.C. § 1132(a)(3).

**COUNT VIII: RESTITUTION, 29 U.S.C. § 1132(a)(3)**
**(All Defendants)**

202. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

203. Aetna is a claims administrator for the ERISA Plans and has standing under 29 U.S.C. § 1132(a)(3) because it is afforded discretion to, *inter alia*, interpret the ERISA Plans, including the ability to determine and process claims on behalf of the ERISA Plans.

204. Section 502(a)(3) of ERISA permits fiduciaries obtain appropriate equitable relief to redress such violations or enforce provisions of ERISA Plans.

205. Although the specific terms of the impacted ERISA Plans vary, relevant and exemplary plan terms are set forth in Paragraph 158, above.

206. On the claims they submitted to Aetna, the Defendants represented that they had assignments of benefits from Aetna members.

207. To the extent Tiero obtained assignments of benefits from members of Aetna's ERISA Plans and then submitted claims to Aetna, Tiero stood in the shoes of the Aetna members with respect to the terms governing reimbursement and recovery of overpayments.

208. Tiero Certify, and Zalzala caused Aetna to overpay on behalf of the ERISA Plans.

209. Aetna made these specifically identifiable overpayments directly to Defendants.

210. Upon information and belief, such payments were deposited into an account controlled by Certify.

211. Aetna has no reason to believe that Defendants have dissipated the overpayments on non-traceable items.

212. Upon information and belief, the overpayments are separately identifiable, even if commingled with other funds, through tracing methodologies.

213. Aetna's ERISA Plans contain provisions authorizing Aetna to recover overpayments made on behalf of the ERISA Plans. Pursuant to these terms, ERISA Plan members and the providers to whom members assign their benefits are on notice that any overpayments are subject to an equitable lien by agreement and rightfully belong to the ERISA Plans.

214. As a result, Aetna seeks equitable relief in the form of restitution, equitable liens by agreement, and a constructive trust on the overpayments to the Defendants on behalf of the ERISA Plans.

**COUNT IX: INJUNCTIVE AND DECLARATORY RELIEF, 29 U.S.C. § 1132(a)(3)**
**(All Defendants)**

215. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

216. Aetna is a claims administrator for the ERISA Plans and has standing under 29 U.S.C. § 1132(a)(3) because it is afforded discretion to, *inter alia*, interpret the ERISA Plans, including the ability to determine and adjudicate claims on behalf of the ERISA Plans..

217. Section 502(a)(3) of ERISA permits fiduciaries to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan[.]"

218. Although the federal mandate requiring private health insurers to cover the cost of OTC at-home COVID-19 tests ended on May 11, 2023, there are currently numerous claims that remain pending or have been denied by Aetna and were billed by Tiero (and/or Certify and Zalzala) prior to the end of the mandate.

219. Additionally, the Defendants have continued to submit claims to Aetna in the

months since the end of the federal mandate, including for claims with dates of service that occurred prior to the end of the mandate. As a result, there is a live and ongoing need for injunctive relief.

220. In some cases, the Defendants are resubmitting claims for OTC at-home COVID-19 tests using the K1034 code (*i.e.*, the correct procedure code) even though the same tests were previously overpaid in reasonable reliance on the Defendants' use of CPT code 87426 (*i.e.*, the incorrect code), creating a risk of multiplying the overpayments.

221. Accordingly, Aetna seeks an Order:

a. enjoining the Defendants from transferring or dissipating funds paid by Aetna on behalf of the ERISA Plans;

b. enjoining Tiero from billing claims for OTC at-home COVID-19 tests to Aetna or the ERISA Plans;

c. enjoining the Defendants from billing or re-billing Aetna for claims that were previously processed, including for claims previously paid under CPT 87426 but re-billed using K1034, without any refund by the Defendants for the overpayment; and

d. enjoining the Defendants from (i) using incorrect procedure codes, (ii) using incorrect place of service codes; (iii) billing for services or goods before they are rendered; (iv) billing for services or goods that are not rendered, or (v) otherwise billing in ways intended to or likely to cause an overpayment.

222. There is no other remedy available at law to prevent the irreparable harm that will result as to Aetna and the ERISA Plans if the Defendants are permitted to continue engaging in

the conduct described herein.

223. Any claims that have been denied by Aetna, are pending, or may be submitted in the future by the Defendants in the same manner as past claims were submitted are not payable.

224. There is a *bona fide*, present need for a declaration as to the unlawfulness of the Defendants' conduct and with respect to their ongoing relationship with one another.

225. Accordingly, Aetna further seeks an Order declaring that:

a. the claims billed by Defendants are not covered by the ERISA Plans;

b. the Defendants received overpayments from the ERISA Plans;

c. the claims Defendants have submitted that remain pending or that may be submitted in the future are not payable under the ERISA Plans if billed as the Defendants have historically billed for OTC at-home COVID-19 test kits; and

d. Where Defendants caused Aetna to overpay on the original fraudulent claims, and Defendants have now submitted additional claims for the same alleged OTC at-home COVID-19 tests kits seeking additional reimbursement thereon, Aetna has no obligation to pay the additional claims.

**COUNT X: DECLARATORY RELIEF, 28 U.S.C. § 2201**
**(All Defendants)**

187. Aetna incorporates the foregoing paragraphs as if fully set forth herein.

188. Under the Declaratory Judgment Act, the court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

189. There is an actual, substantial, and present controversy between Aetna and Defendants concerning the payment of claims submitted by Tiero that are currently pending, and with respect to the claims that Tiero continues to submit.

190. As set forth above, Aetna and Defendants have adverse legal interests. Aetna contends that the claims submitted by the Defendants are not payable, while Tiero and Certify contend the claims are payable and that Aetna has underpaid them.

191. Tiero has also threatened to pursue payment from Aetna and Aetna's members.

192. Although the federal mandate requiring private health insurers to cover the cost of OTC at-home COVID-19 tests ended on May 11, 2023, there are currently numerous claims that remain pending or have been denied by Aetna, and were billed by the Defendants prior to the end of the mandate.

193. Additionally, the Defendants continue to submit claims to Aetna, including claims with dates of service that occurred prior to the end of the mandate.

194. Tiero is also rebilling claims to Aetna that Aetna already paid in reasonable reliance on the Defendants' fraudulent misrepresentations. Specifically, the Defendants are re-billing the same claims with new procedure and place-of-service codes, creating a risk of further overpayments by Aetna. This practice appears to be ongoing.

195. The controversies between Aetna and Defendants are substantial and of sufficient immediacy and reality to warrant declaratory relief.

196. There is a *bona fide*, present need for a declaration as to the unlawfulness of the Defendants' conduct and with respect to their ongoing relationship with one another.

197. Accordingly, Aetna seeks an Order declaring that:

a. the claims Defendants have submitted that remain pending or that may be submitted in the future are not payable, even as to the non-ERISA plans, if billed as the Defendants have historically billed for OTC at-home COVID-19 test kits;

b. where Defendants caused Aetna to overpay on the original fraudulent claims, and Defendants have now submitted additional claims for the same alleged OTC at-home COVID-19 tests kits seeking additional reimbursement thereon, Aetna has no obligation to pay the additional claims; and

c. Defendants violated 18 Pa. C.S.A. § 4117 and C.G.S.A. § 53-442 - 444.

**COUNT XI: UNJUST ENRICHMENT**
**(All Defendants)**

198. Aetna hereby incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

199. Tiero and Certify knowingly received and accepted a benefit from Aetna in the form of payments for COVID-19 test claims.

200. Upon information and belief, Tiero and Certify subsequently transferred a portion of the payments made by Aetna to Zalzala.

201. Tiero, Certify, and Zalzala received this benefit at Aetna's expense.

202. The circumstances are such that it would be unjust for Tiero, Certify, or Zalzala to retain this benefit.

203. In particular, it would be unjust for Tiero, Certify, or Zalzala to retain payments made by Aetna when the Defendants:

a. should not have billed the tests to Aetna;

b. billed incorrectly for a type of test with a higher payment rate;

c. billed with incorrect dates of service to circumvent Aetna's reimbursement policies;

d. billed for a referring provider who was not, in fact, a referring provider, but a provider who gave his NPI to the other Defendants to use as they wished without supervision; and

e. did not provide some of the tests to Aetna members.

204. The Defendants' conduct in connection with these payments was inequitable and unlawful, as detailed above.

205. Accordingly, in equity and good conscience, Aetna is entitled to the return of funds it paid to Tiero and Certify under the foregoing circumstances.

**COUNT XII: MONEY HAD AND RECEIVED**
**(All Defendants)**

206. Aetna hereby incorporates the foregoing paragraphs as if fully set forth herein and further alleges as follows.

207. As set forth herein, Tiero and Certify received or obtained possession of funds belonging to Aetna in the form of payments for COVID-19 test claims.

208. Upon information and belief, Tiero and Certify subsequently transferred a portion of the payments made by Aetna to Zalzala

209. Each of the Defendants appreciated this benefit.

210. Aetna would not have paid the claims at issue but for the wrongful conduct of Defendants, including their submission of claims containing material misrepresentations, as described herein.

211. The acceptance and retention of Aetna's funds by Tiero, Certify, and Zalzala is unjust, and in equity and good conscience, the funds should be returned to Aetna.

212. Accordingly, Aetna seeks the return of money had and received as compensation.

## PRAYER FOR RELIEF

WHEREFORE, Aetna respectfully requests judgment in its favor and:

a. actual and compensatory damages;

b. punitive damages;

c. treble damages pursuant to 18 Pa. C.S.A. § 4117(g);

d. reasonable investigation expenses, costs of suit, and attorneys' fees pursuant to 18 Pa. C.S.A. § 4117(g);

e. costs and attorneys' fees pursuant to 29 U.S.C. § 1132(g);

f. injunctive relief as requested herein;

g. declaratory relief as requested herein;

h. prejudgment and post-judgment interest; and

i. an award of any other relief in law or equity that the Court deems just and proper.

Dated: August 21, 2023

By: */s/ Bryan D. Bolton*

**FUNK & BOLTON, P.A.**

Bryan D. Bolton (MD Bar #8312010049)
100 Light Street, Suite 1400
Baltimore, MD 21202
T: (410) 659-7700
bdbolton@fblaw.com

**ROBINS KAPLAN LLP**

Nathaniel J. Moore (*pro hac vice*)
Stephanie A. Chen (*pro hac vice*)
Robins Kaplan LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
T: (612) 349–8500
F: (612) 339–4181
nmoore@robinskaplan.com
schen@robinskaplan.com

*Counsel for Plaintiffs Aetna Life Insurance Company and Aetna Health Inc.*